## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | |
|---|---|
| JOHN E. FOOTE ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.  08-cv-1088 |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | |
| ) | |
| Defendant. ) | |

## O R D E R  &  O P I N I O N

This matter is before the Court on Plaintiff's Motion for Summary Judgment (Doc. 15) and Defendant's Motion for Summary Affirmance and Memorandum in Support (Docs. 16 & 17).  For the reasons set forth below, Plaintiff's Motion for Summary Judgment (Doc. 15) is DENIED, and Defendant's Motion for Summary Affirmance (Doc. 16) is GRANTED.

### BACKGROUND

**I.   Procedural History**

In December, 1994, Plaintiff applied for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. (Tr. 137-40).  His application, alleging a disability onset date of August 8, 1990, was denied. (Tr. 159). Plaintiff filed for reconsideration of the denial, which was subsequently affirmed.  (Tr. 163-64, 174). Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").

After one reassignment and several hearings,[1] ALJ Rickert issued a decision that Plaintiff was not disabled and the Appeals Council denied review of the decision. (Tr. 5, 14-28). Plaintiff sought judicial review of the ALJ's decision and, on January 17, 2002, United States District Judge Mihm of the Central District of Illinois upheld the decision. (Tr. 569-86).

On October 15, 2003, Plaintiff filed a new application for DIB alleging disability beginning on April 20, 1998. (Tr. 546). Because the Plaintiff's disability insured status was found to have expired as of December 31, 1997, his claim was denied both initially and upon reconsideration. (Tr. 546). Plaintiff subsequently requested a hearing, and, on February 22, 2006, amended his alleged onset date to December 1, 1997. (Tr. 546). Although the principles of *res judicata* would have ordinarily barred review because Plaintiff's alleged onset date fell within the period already adjudicated in his 1994 application, ALJ Thompson determined that changes in the listing of impairments since the prior adjudication required that a new medical determination be made.[2] (Tr. 547, 1324).

ALJ Thompson conducted hearings on November 20, 2006 and May 7, 2007. (Tr. 1321, 1368). After these hearings the ALJ determined that Plaintiff was not disabled within the terms of the Social Security Act from December 1, 1997 until

---

[1] Plaintiff's claim was initially heard by ALJ Weinman, however he resigned before issuing a decision prompting the need for a new hearing in front of ALJ Rickert. (Tr. 14-15). ALJ Rickert conducted a new hearing on December 16, 1997, and a supplementary hearing on April 23, 1998. (Tr. 15).

[2] In Commissioner's Memorandum in Support of His Motion for Summary Affirmance (Doc. 17), the Defendant appears to ignore the fact that *res judicata* does not apply in this case. Accordingly, this Court will not examine the findings of ALJ Rickert or Judge Mihm, but only the determination of ALJ Thompson in the disposition of Plaintiff's current DIB application.

December 31, 1997, and thus denied benefits.[3]  (Tr. 547).  On March 13, 2008, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner in this case.  (Tr. 545).  On April 15, 2008, Plaintiff filed the instant action in this Court seeking review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  (Doc. 1).  On March 9, 2010, Plaintiff filed his Motion for Summary Judgment,[4] and on April 12, 2010, Defendant filed its Motion for Summary Affirmance.  (Docs. 15 & 16).

## II.    Relevant Medical History[5]

In January, 1974, Plaintiff fell onto an iron bar while at work, injuring his ribs and lower back.  (Tr. 1310).  Plaintiff's serious medical complaints which may or may not stem from this incident began in August, 1990, when he stepped out of a pickup truck and was unable to control his right foot.  (Tr. 1298).  Following an evaluation by Dr. Kalyan-Raman on August 29, 1990, Plaintiff was admitted to

---

[3] ALJ Thompson determined that this was the only relevant time period because Plaintiff's disability insured status expired on December 31, 1997 and Plaintiff is not entitled to benefits for any disability that did not onset prior to its termination. 42 U.S.C. §§ 423(a)(1)(A), (c)(1), 414(a) (2010).

[4] On August 10, 2009, Plaintiff was informed by the Clerk of the Court of his obligation to file a Motion for Summary Judgment within 30 days.  (Doc. 11).  On February 10, 2010, this Court, *sua sponte*, granted Plaintiff an additional 30 days in which to file his motion or otherwise have his claim dismissed for failure to prosecute.  (Doc. 14).  Plaintiff, who is proceeding *pro se*, subsequently filed this motion prior to the extended deadline.  (Doc. 15).

[5] Plaintiff's Motion for Summary Judgment does not conform to the pleading requirements of Local Rule 8.1(D) in several respects, all of which are deemed necessary to highlight Plaintiff's specific objections to the ALJ's decision and the reasons and incidental support in the record for those objections.  However, because the only issues Plaintiff appears to be challenging in this Court relate to whether or not he suffers from a neurogenic bladder such that he cannot engage in substantially gainful activity, the Court will focus its review of Plaintiff's medical history, hearing testimony, and the ALJ determination, on matters relevant to this diagnosis.

Methodist Medical Center of Illinois ("MMCI") for further testing. (Tr. 250-51). Upon admission to MMCI, patient complained of "a six month history of hesitancy with urine flow and the feeling of 'not finishing.'" (Tr. 222). On September 7, a Complete Urodynamic Study was performed, including the performance of a cystometrogram. (Tr. 235). The tests showed that Plaintiff had normal nerve and muscle function, but that there was a "decreased flow pattern which could be consistent with his prostatits or, perhaps bladder outlet obstruction." (Tr. 235).

After discharge from MMCI, Plaintiff continued to undergo evaluations and treatments for a variety of medical problems, including pain and weakness in his lower right leg, chronic back pain, and blurred vision, for which doctors could not find a cause.[6] (Tr. 298, 301, 303). In June of 1991, Plaintiff underwent further testing at the Mayo Clinic, including another Urodynamic Study involving a cystometrogram, from which the evaluating doctor concluded that there was no evidence of a neurogenic bladder and no need for further treatment of Plaintiff's bladder complaints. (Tr. 278).

In March of 1993, Plaintiff visited the Veteran's Affairs Medical Clinic ("VAMC") in Iowa City where he underwent another cystometrogram. (Tr. 367-70). Based upon the test results, Plaintiff was diagnosed with a neurogenic bladder and instructed on self-catheterization. (Tr. 366-370). In October, 1993, Plaintiff reported to the VAMC that he was performing self-catheterizations four to five times daily, without any urinary infections. (Tr. 382). In September, 1996, the

---

[6] Plaintiff underwent significant testing from 1990 until 1993 to determine the cause of his back and leg problems, including a full range of tests at the Mayo Clinic, however no doctor could reach a conclusion as to what was causing Plaintiff's problems. (*See generally* Tr. 219-383).

4

VAMC at Iowa City performed an ultrasound of Plaintiff's kidneys and bladder and compared it to the examination performed in 1993. (Tr. 1071). The report indicated that 1) the Plaintiff's kidneys were normal in terms of size and shape, 2) his bladder wall was slightly thickened, and 3) the prostate gland was at the upper limits of normal size. (Tr. 1071). Plaintiff was subsequently prescribed a six-month supply of catheters by the VAMC. (Tr. 435).

In November of 1997 and 1998, Plaintiff returned to the VAMC and reported self-catheterizing six times per day without infection, and was again prescribed catheters. (Tr. 1010-11). Another ultrasound was obtained in November, 1999, at which time it was noted that there had been no significant changes since 1996. (Tr. 1070). Since that time, Plaintiff has developed other medical problems involving his lower left side and teeth, however his medical records do not indicate any significant change in terms of his bladder condition. (Tr. 897-98). As of November 2006, Plaintiff reported that he continued to self-catheterize at least five times a day. (Tr. 1347).

### III.   Hearing Testimony

####    A.   Initial Hearing

On November 20, 2006, ALJ Thompson held a hearing on Plaintiff's application for benefits, at which Plaintiff was represented by an attorney, Thomas Henry. (Tr. 1321-1367). At this hearing, Plaintiff testified that he was unable to work in 1997 due to extreme weakness in his legs, a lack of stamina and the need to self-catheterize. (Tr. 1337-38). With regards to the self-catheterization, he stated that he needed to perform the procedure between five and ten times a day

5

depending upon factors such as the weather and his fluid intake, (Tr. 1338), and that the procedure itself took less than four minutes. (Tr. 1346). According to the Plaintiff, the most time-consuming aspect of the procedure was cleaning the equipment, which could take up to a half an hour. (Tr. 1346-47).

Plaintiff stated that he could do certain activities, such as cook, wash dishes, make the bed, and take care of his own hygiene, but that he needed assistance with vacuuming, laundry, and going to the grocery store. (Tr. 1344). He also testified that he could walk about a block and stand for about 15 or 20 minutes in 1997. (Tr. 1340).

Dr. James McKenna, M.D., also testified at the hearing as a medical expert. Dr. McKenna stated that he did not have sufficient medical records to be able to form an opinion at that time because he did not have access to any of Plaintiff's medical records from 1995 until 2000. (Tr. 1359). Dr. McKenna also had questions regarding the inconsistent complaints and test results which appeared in Plaintiff's file. (Tr. 1360). This led him to question whether the Plaintiff had some type of conversion reaction because "the actual objective evidence is all for the journal of negative results." (Tr. 1363). However, Dr. Valez, a licensed psychologist, responded that she believed "to a reasonably [sic] degree of psychological certainty that [Plaintiff] is suffering from bonafide medical conditions" and that she "would probably rule out conversion disorder or conversion reaction." (Tr. 1365). Because Dr. McKenna did not have sufficient information to form an opinion as to Plaintiff's medical condition in 1997 (the relevant onset date), ALJ Thompson set the case for

6

a supplemental hearing after Dr. McKenna had been given access to the entire record. (Tr. 1366).

### B.    Supplemental Hearing

On May 7, 2007, ALJ Thompson presided over the supplemental hearing. (Tr. 1368-1415). The substantive portion of the hearing began with Dr. McKenna's testimony regarding Plaintiff's impairments.[7] (Tr. 1378-1380). Dr. McKenna stated that Plaintiff suffered from a fresh vertebrae compression fracture in his lumbar spine, a bladder outlet obstruction, and a borderline enlarged prostate. (Tr. 1379). When asked whether there appeared to be any other problems, the doctor testified that there did not. (Tr. 1380). When asked whether, based upon his experience, education and training, and his review of the medical evidence, he believed that Plaintiff's impairments met any of the Social Security Act medical listings, he stated that he did not. (Tr. 1383). However, the doctor also testified that if Plaintiff had the compression fracture in 1997, this would have resulted in a severe impairment, which would have limited him to lifting and carrying up to 20 pounds frequently and 50 pounds occasionally.

Following questioning by ALJ Thompson, Plaintiff's attorney engaged Dr. McKenna in a discussion focused upon whether or not Plaintiff suffered from a neurogenic bladder. (Tr. 1385-1407). While Dr. McKenna did not originally have a copy of the cystometrogram[8] upon which Plaintiff's diagnosis was based, this was

---

[7] A great deal of time at the outset of the hearing was concerned with ensuring that Dr. McKenna had seen all records relevant to Plaintiff's application.
[8] The Court notes that there seems to be some confusion in the record concerning whether the test performed was a "cystogram" or a "cystometrogram." While there

sent to him at the beginning of questioning. (Tr. 1385-91). Dr. McKenna pointed out that, while he himself was not a urologist and thus could not interpret the test results directly, the doctor performing the test did not actually state that Plaintiff suffered from a neurogenic bladder. (Tr. 1393). Rather, it was a general practitioner at a medical clinic in Peoria that made this diagnosis upon receipt of the test. (Tr. 1394). Dr. McKenna stated that Plaintiff did have a bladder obstruction which required him to self-catheterize, but that he could not be certain that this was due to a neurogenic bladder because he could not find a cause for such impairment and it did not fit the clinical pattern. (Tr. 1398-99).

Plaintiff's attorney then asked Dr. McKenna about the self-catheterization process. (Tr. 1403-04). Dr. McKenna stated that a person suffering from neurogenic bladder would have to self-catheterize from four to eight times per day, and that the process would take about ten to fifteen minutes, or five to ten minutes if the patient was practiced. (Tr. 1403-04). He also testified that the process could be performed in almost any washroom, but that the person would have to carry and/or store little packs containing pre-cleaned catheters for use when outside of the home. (Tr. 1405).

A vocational expert, James Ragains, was also present at the hearing. Mr. Ragains testified that a hypothetical claimant of the same age, education, and experience as Plaintiff, who was able to sit, stand or walk six hours per day, could frequently lift 20 pounds and occasionally lift 50 pounds, had no problems with using pedals with his feet or pushing or pulling with his hands and arms, no

---

is a medical difference between the two procedures, it is not relevant for the Court's purposes as all parties to the proceedings were referring to the same test.

postural limitations, and no problems with vision, communications, or the environment would not be able to perform Plaintiff's past work as Plaintiff performed it, but would be able to perform it in the national economy. (Tr. 1409). He then testified that Plaintiff also had transferable skills which he could use to work at a light exertional level in some maintenance mechanics areas, as well as in unskilled work areas such as assembly work and other bench craft oriented production positions. (Tr. 1410-11).

When questioned by Plaintiff's attorney, Mr. Ragains stated that a person who had to catheterize himself twice in the morning and twice in the afternoon would not be able to engage in any of these types of jobs without an accommodation from his employer. (Tr. 1412). He stated that these types of jobs usually have two ten minute breaks, plus a thirty or sixty minute lunch break. (Tr. 1412-13). When questioned by ALJ Thompson, Mr. Ragains testified that if a person only had to self-catheterize two or three times in an eight hour work period, he could do it without impacting his job performance. (Tr. 1413). Finally, Mr. Ragains stated that these types of employers typically place lockers next to the bathroom facilities where a person could store their catheters. (Tr. 1413).

## IV.  ALJ's Decision

### A.  Insured Status and Impairments

ALJ Thompson issued his decision on June 13, 2007. (Tr. 545M-566). He first determined that Plaintiff last met the insured status requirements of the Social Security Act on December 31, 1997, and that he did not engage in substantial gainful activity from his alleged onset date until that time. (Tr. 549). He then

9

found that Plaintiff suffered from a degenerative back condition and bladder outlet obstruction, which constituted severe impairments. (Tr. 549). He noted Plaintiff's argument that the bladder condition was neurogenic bladder, but stated that because the validity of that diagnosis was questionable, he decided to utilize the diagnosis of bladder outlet obstruction, which Dr. McKenna had testified was established by the medical evidence. (Tr. 549).

Next, the ALJ found that Plaintiff's difficulties did not meet any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 that would automatically render him disabled. (Tr. 550). Listing 1.04, labeled "Disorders of the spine" did not apply to Plaintiff's degenerative back condition because there was no evidence of compromise of a nerve root or the spinal cord resulting in the listed limitations. (Tr. 550). Further, it did not matter whether Plaintiff's bladder condition was labeled a neurogenic bladder or bladder outlet obstruction, because neither would meet or equal the criteria of any listed impairment. (Tr. 550).

### B.  Residual Functional Capacity

After determining that none of the listings applied to Plaintiff and considering the evidence in the record, the ALJ found that, through the date last insured, Plaintiff had the Residual Functional Capacity ("RFC") to sit for up to six hours in an eight-hour workday, stand for up to six hours in an eight-hour workday, walk for up to six hours in an eight-hour workday, occasionally lift and carry up to fifty pounds, frequently lift and carry up to twenty pounds, and engage in unlimited pushing and pulling or operation of foot controls (subject to the lifting restrictions). (Tr. 550). Further, he had no postural, manipulative, visual or communicative, or

environmental limitations.[9] (Tr. 550). In reaching this conclusion, ALJ Thompson considered all of Plaintiff's symptoms and the extent to which they were consistent with objective medical evidence in accordance with 20 C.F.R. § 404.1529, as well as medical opinions regarding Plaintiff's condition in accordance with 20 C.F.R. § 404.1527. (Tr. 550).

Following a review of the testimony at the two hearings, (Tr. 551-554), the ALJ found that Plaintiff's medically determinable impairments could produce Plaintiff's alleged symptoms, but that Plaintiff's statements regarding the intensity, persistence, and limiting effects of these symptoms were not completely credible. (Tr. 554). This was especially the case because the relevant time period within which the ALJ had to find the onset of a disability was the month of December 1997, and, with the exception of a urology visit on November 10, 1997 to obtain more catheters, Plaintiff did not have any medical records during this time period. (Tr. 555).

With regards to Plaintiff's urological problems, the ALJ noted that he found it more likely that Plaintiff suffered from a bladder outlet obstruction, as opined by Dr. McKenna, than a neurogenic bladder, especially because there was no cause for the development of a neurogenic bladder close in time to its onset. (Tr. 555). Still, ALJ Thompson made clear that it was not of importance which condition Plaintiff suffered from because no one disputed his need to self-catheterize. (Tr. 556). The ALJ determined that Plaintiff's need to self-catheterize had no direct impact on the exertional or non-exertional demands of basic work activity. (Tr. 556). The real

---

[9] The Court would again like to stress that this finding concerned Plaintiff's RFC in 1997, not his abilities in 2007. (Tr. 554-55).

issue was whether Plaintiff's need to perform this procedure, both in terms of frequency and duration, would require special accommodation from a hypothetical employer. (Tr. 556).

In terms of frequency, ALJ Thompson looked at Plaintiff's medical records from 1997 and 1998, as well as testimony given by the Plaintiff on December 16, 1997, to determine that in December of 1997, Plaintiff typically self-catheterized six times a day. (Tr. 556). Based upon this conclusion, the ALJ extrapolated that Plaintiff needed to perform the procedure once every four hours, or, if Plaintiff had meant he self-catheterized six times while awake, approximately every two hours and forty minutes. (Tr. 556). Because a standard work schedule allows for breaks every two hours (a morning break, lunch break, and afternoon break), the ALJ concluded that if Plaintiff catheterized himself before work, on each break, and then again after work, he could perform the procedure up to five times in a nine hour period, which "would certainly accommodate his professed need to self-catheterize during the day." (Tr. 556). In terms of duration, the ALJ looked at Dr. McKenna's testimony that a person practiced in the procedure could perform it in five to ten minutes as well as Plaintiff's testimony that actual catheterization did not take long, to determine that if Plaintiff cleaned his equipment at home (which the ALJ found that he could do), he would have ample time to perform the procedure during work breaks. (Tr. 557). Accordingly, the ALJ concluded that there was "no reason

to believe that the [Plaintiff] could not meet his need for self-catheterization during the established work breaks.[10] (Tr. 557).

### C. Ability to Work

After finding this RFC, ALJ Thompson determined that Plaintiff would have been able to perform his past relevant work as an industrial truck mechanic within the parameters of that position as generally performed in the national economy. (Tr. 563-64). Further, the ALJ found that even if Plaintiff could not have performed this past relevant work, he still would not have been disabled during the relevant time period because, considering his age, education, work experience, and RFC, there were a significant number of jobs that existed in the national economy to which his previously acquired skills would have transferred. (Tr. 565). These jobs included maintenance mechanic, repairer of tools, product assembler, and bench assembler. (Tr. 565). Finally, for all of these positions, the ALJ relied on the testimony of a vocational expert to find that Plaintiff could function without accommodation for his need to self-catheterize. (Tr. 565).

## DISCUSSION

### I. Legal Standard

To be entitled to disability benefits under the Social Security Act, a claimant must prove that he is unable to "engage in any substantial gainful activity by

---

[10] ALJ Thompson proceeded to discuss why he did not find any of Plaintiff's professed neurological problems credible as of December, 1997. (Tr. 557-63). The main reasons for this determination were the dearth of medical records and/or prescriptions within a five year window of the relevant time period, as well as several medical opinions that the Plaintiff's problems were due to functional overlay. (Tr. 558-60).

reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). To determine if the claimant is unable to engage in any substantial gainful activity, the Commissioner of Social Security engages in a factual determination. *See McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). That factual determination is made by using a five-step sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; *see also Maggard v. Apfel*, 167 F.3d 376, 378 (7th Cir. 1999).

In the first step, a threshold determination is made to decide whether the claimant is presently involved in a substantially gainful activity. 20 C.F.R. §§ 404.1520(a)(i), 416.920(a)(i). If the claimant is not under such employment, the Commissioner of Social Security proceeds to the next step. At the second step, the Commissioner evaluates the severity and duration of the impairment. 20 C.F.R. §§ 404.1520(a)(iii), 416.920(a)(iii). If the claimant has an impairment that significantly limits his physical or mental ability to do basic work activities, the Commissioner will proceed to the next step. At the third step, the Commissioner compares the claimant's impairments to a list of impairments considered severe enough to preclude any gainful work; and, if the elements on the list are met or equaled, he declares the claimant eligible for benefits. 20 C.F.R. §§ 404.1520(a)(iv), 416.920(a)(iv).

If the claimant does not qualify under one of the listed impairments, the Commissioner proceeds to the fourth and fifth steps. At the fourth step, the claimant's RFC is evaluated to determine whether the claimant can pursue his past work. 20 C.F.R. §§ 404.1520(a)(iv), 416.920(a)(iv). If he cannot, then, at step five, the Commissioner evaluates the claimant's ability to perform other work available

in the economy. 20 C.F.R. §§ 404.1520(a)(v), 416.920(a)(v). The claimant has the burden to prove disability through step four of the analysis, *i.e.*, he must demonstrate an impairment that is of sufficient severity to preclude him from pursuing his past work. *McNeil*, 614 F.2d at 145. However, once the claimant shows an inability to perform his past work, the burden shifts to the Commissioner, at step five, to show the claimant is able to engage in some other type of substantial gainful employment. *Id*.

Once a case reaches a federal district court, the court's review is governed by 42 U.S.C. § 405(g), which provides, in relevant part, "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Maggard*, 167 F.3d at 379 (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). In a substantial evidence determination, the Court will review the entire administrative record, but it will "not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). The Court must ensure that the Commissioner "build[s] an accurate and logical bridge from the evidence to his conclusion," even though he need not have addressed every piece of evidence. *Id.* at 872.

## II. Analysis

Plaintiff, who is appealing the Commissioner's decision *pro se*, submitted a very brief statement accompanied by fifty-seven pages of documents that are

already part of the administrative transcript.[11]  Plaintiff appears to argue that 1) the ALJ erred in finding that he suffered from a bladder outlet obstruction rather than a neurogenic bladder, and 2) the ALJ erred by failing to order a new test before making this determination.[12]

### A. Failure to Find a Neurogenic Bladder

To help support his argument that ALJ Thompson erred in finding that Plaintiff suffered from a bladder outlet obstruction rather than a neurogenic bladder, Plaintiff has submitted various medical records, including 1) a Clinic Note signed by Dr. Winter on March 16, 1993 diagnosing Plaintiff with a neurogenic bladder, 2) the Cystometrogram performed at the VAMC in 1993 upon which Dr. Winter's diagnosis was based, 3) self-catheterization instructions provided to Plaintiff by the VAMC in March of 1993, 4) a 1996 prescription for catheters, 5) a Disability Determination made in 1993 diagnosing Plaintiff with a neurogenic bladder, 6) Plaintiff's record of admission to MMCI in 1990 which notes his history of hesitancy with urine flow, and 7) two letters from Dr. Hoffman to Plaintiff's

---

[11] Local Rule 8.1(D) requires Plaintiff's Motion for Summary Judgment to "state with particularity which findings of the Commissioner are contrary to law." Further, the Plaintiff is to "identify the statute, regulation or case law under which the Commissioner allegedly erred" and "cite to the record by page number the factual evidence which supports plaintiff's position." While *pro se* plaintiffs are entitled to more lenient standards and the liberal construction of their pleadings, they must still comply with procedural rules. *Anderson v. Hardman*, 241 F.3d 544, 545 (7th Cir. 2001). When a *pro se* litigant fails to comply, the Court "cannot fill the void by crafting arguments and performing the necessary legal research" as this would not promote the Court's interest in the uniform administration of justice. *Id.* Thus, this Court will not create arguments for Plaintiff, but will do its best to construe the arguments that Plaintiff appears to have made.

[12] Plaintiff states, "The main issue since 1993 has been my NEUROGENIC BLADDER [sic]," and "I also asked for the ALJ to give me a new test if he didn't like my doctors [sic] tests."

attorney discussing, amongst other medical issues, Plaintiff's needs to self-catheterize and his inability to engage in substantially gainful employment.[13] (Doc. 15).

This Court will only remand if the ALJ's decision was not based on "substantial evidence." *Maggard*, 167 F.3d at 379. Here, ALJ Thompson and Dr. McKenna, who served as the medical expert at the hearing, considered the entirety of Plaintiff's medical record, including the 1993 Cystometrogram, the diagnosis of Dr. Winter, the Plaintiff's prescription history, and the fact that Plaintiff had to self-catheterize. (Tr. 553-54, 1392-96). Contradicting this evidence was a urological assessment done at the Mayo Clinic in 1991 in which Dr. Utz concluded there was no neurogenic bladder (Tr. 278), and the testimony of Dr. McKenna that there was no evidence of an injury that would cause neurogenic bladder, that no *urologist* had ever explicitly diagnosed Plaintiff with a neurogenic bladder, and that many doctors would simply rely on Plaintiff's representation that he was suffering from such a condition when noting it in their diagnoses. (Tr. 1394, 1398-1400).

The ALJ also considered the letters written by Dr. Hoffman, but concluded that these were not credible. (Tr. 560-61). With regards to the 1995 Letter, the ALJ found that 1) there was a large variance between Dr. Hoffman's examination and a similar one performed by Dr. Rabinowitz during the same year, 2) medical experts in both the current and previous disability hearings had considered and discounted

---

[13] Plaintiff also submitted various other documents, some of which will be discussed below. It appears, however, that Plaintiff simply submitted all documents in his possession at the time of the filing (Doc. 15 at 2) ("The [e]nclosed material is all [I] have left after many ALJ hearings.") Accordingly, those documents which the Court cannot construe to relate to an argument set out by the Plaintiff in the instant motion are not discussed in this opinion.

Dr. Hoffman's findings, 3) there was no evidence of an ongoing treatment relationship between Plaintiff and Dr. Hoffman, and 4) Dr. Hoffman had misconstrued Plaintiff's prior medical records. (Tr. 560). With regards to the 2000 Letter, the ALJ found that there was no record that Plaintiff had seen Dr. Hoffman since 1995, that his findings were largely out of proportion to other medical records, and that they were at odds with a stress test performed on Plaintiff only a few months earlier. (Tr. 561). A credibility determination made by the ALJ will not be disturbed unless the finding is clearly erroneous. *See Imani v. Heckler*, 797 F.2d 508, 510 (7th Cir. 1986). Accordingly, the Court will not disturb the ALJ's credibility finding here.

While the ALJ did not explicitly consider every piece of evidence put forward by the Plaintiff which showed the diagnosis of neurogenic bladder, he considered enough to build an accurate and logical bridge from the evidence in the record to his conclusion that Plaintiff's bladder condition was a bladder outlet obstruction. *See Clifford,* 227 F.3d at 869. Accordingly his findings were based on substantial evidence and will not be disturbed.[14]

---

[14] Not only was ALJ Thompson's finding regarding Plaintiff's bladder condition supported by substantial evidence, the ALJ also made it clear at several points that Plaintiff would not have been found to be disabled even if the ALJ did determine that he suffered from a neurogenic bladder. (Tr. 556) ("However, strictly speaking, it matters not whether the claimant's need to self-catheterize is caused by bladder outlet obstruction . . . or by neurogenic bladder."). Neither condition would have satisfied a listing impairment such that Plaintiff would be automatically disabled. (Tr. 550) ("Whether the claimant's genitourinary impairment is labeled bladder outlet obstruction or neurogenic bladder, it would not meet or equal the criteria for any listed genitourinary impairment."). Further, the only relevant symptom of Plaintiff's bladder condition was his need to self-catheterize, and no one disputed that this was the case. (Tr. 556) ("The real issue is the claimant's need to self-

**B. Failure to Order New Test**

Plaintiff also appears to argue that ALJ Thompson erred in not ordering a new cystometrogram in order to determine whether or not he suffered from a neurogenic bladder. Although it was Plaintiff's burden to prove his disability at the hearing, the ALJ does have a limited duty to develop a full and fair record. *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000). This duty includes ordering a new consultative examination pursuant to 20 C.F.R. § 404.1512(f) when the information needed to determine if Plaintiff is disabled is not readily available from the records of Plaintiff's medical treatment source.

Here, Plaintiff submitted a Letter from ALJ Wienman to Plaintiff as part of his 1994 DIB application, indicating his desire for a new cystometrogram in order to properly evaluate Plaintiff's claim. (Doc. 15 at 47). It appears from the record, however, that this procedure was never performed due to the fact that Plaintiff was able to locate and obtain the cystometrogram that he underwent at the VAMC in 1993. (Doc. 15 at 48; Tr. 433). Regardless of what took place in the 1996 hearing, the hearings under review in the instant action are those presided over by ALJ Thompson in 2006 and 2007. These hearings were seeking to determine Plaintiff's medical condition in 1997. (Tr. 554) ("[T]he focus of this decision is the claimant's medical condition during the month of December 1997. Therefore, the discussion of more recent medical records will be limited to those records which provide insight into the claimant's medical condition and likely functioning during the period under

---

catheterize, which no one disputes, and the impact that has on the claimant's ability to work.").

consideration."). Accordingly, ALJ Thompson did not have a duty to seek additional tests in 2007, because such tests would be of little use in determining Plaintiff's disability status as of December 1997.[15]

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (Doc. 15) is DENIED, and Defendant's Motion for Summary Affirmance (Doc. 16) is GRANTED.  IT IS SO ORDERED.

CASE TERMINATED.

Entered this 25th day of August, 2010.

s/ Joe B. McDade<br>JOE BILLY McDADE<br>United States Senior District Judge

---

[15] Further, as noted above, even if the ALJ found that Plaintiff suffered from a neurogenic bladder, this would not have been sufficient to find that Plaintiff was disabled.